# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | **)** | |
| | **)** | |
| **Plaintiff,** | **)** | |
| | **)** | |
| **v.** | **)** | **No. 24-146 (DLF)** |
| | **)** | |
| **PAUL ORTA, Jr.** | **)** | |
| | **)** | |
| **Defendant.** | **)** | |
| ——————————————— | **)** | |

## DEFENDANT PAUL ORTA'S
## MEMORANDUM IN AID OF SENTENCING

### I.      Introduction

Mr. Orta will be before the Court for sentencing after having accepted responsibility for his actions at the Capitol building on January 6, 2021, and pleaded guilty in violation of 40 U.S.C. § 231(a)(3). He is remorseful for his actions, deeply regrets his conduct, and is prepared to accept responsibility and the consequences for his actions.

For the foregoing reasons, Mr. Orta, through counsel, respectfully requests that the Court impose a non-custodial sentence with appropriate special conditions along with the $2,000 restitution obligation. Such a sentence would be sufficient but not greater than necessary to meet the goals of sentencing, as required by 18 U.S.C.§ 3553(a).

## II.     Procedural History

On January 25, 2021, less than three weeks after his participation in the riots at the United States Capitol on January 6th, and before being contacted by any law enforcement, Mr. Orta attempted to turn himself in to the FBI by traveling from his home in Blue Earth, Minnesota to the FBI Field Office in Minneapolis. While at the office, he gave a voluntary interview (with no attorney present) in which he was forthcoming about his actions at the Capitol and expressed remorse and shame.  However, despite his efforts to turn himself in, after the interview, he was told to leave.  Mr. Orta provided his information and was told that someone would contact him. For nearly three years he waited anxiously. Then, nearly three years after his voluntary appearance at the FBI Office, on November 13, 2023, the FBI obtained a warrant for Mr. Orta's arrest.  By sheer coincidence, that very same day while driving home from work, Mr. Orta was pulled over by a local police officer for a non-functioning headlight. After checking his driver's license, the officer discovered the warrant and Mr. Orta was eventually taken to the Blue Earth Police Department in Minnesota, where he went willingly. The following day, he was arrested pursuant to the criminal complaint charging him with misdemeanors in violation of 18 U.S.C. § 1752 (a)(1) and (2) and one felony count in violation of 18 U.S.C. § 231 (a)(3). He appeared via video for his initial appearance in Magistrate Court on September 28, 2023. The government did not seek pre-trial detention.

Mr. Orta expressed an immediate desire to plead guilty as he had always been planning to do so since he attempted to turn himself in in January 2021. On May 14, 2024, he entered a guilty plea to Count three of the criminal information charging him with civil disorder in violation of 40 U.S.C. § 231(a)(3). Mr. Orta has been compliant with all conditions of his release.

## III.    Application of the Sentencing Factors

Mr. Orta comes before the Court fully prepared to accept whatever sentence is deemed appropriate. He has consistently expressed that he does not believe he deserves special treatment, and he has shown hesitancy in requesting anything that indicates as much. But Counsel has an obligation to present the mitigating evidence and does so here.

### A. Mr. Orta's history and characteristics demonstrate that a below guidelines sentence is appropriate.

Many January 6 defendants that come before this Court have benefited from considerable privilege in their upbringing. Paul Orta, however, is different. His childhood and early adult years were marked by the struggles of a disadvantaged, indigent individual. Despite these challenges, Mr. Orta is an exemplary citizen with a steady job and a promising future. He has reached his current position in life through perseverance and hard work, with little to no assistance from others, and is on a positive path of continued growth and self-improvement.

#### 1. Background and Family

Paul Orta Jr., now 35 years old, was born to his mother Adelaida Atkinson in Harlingen, Texas. He grew up in Rio Hondo, Texas, a predominantly Latino town

near the Mexican border, known for its widespread poverty.[1]  Paul's biological father left when he was an infant, and Paul has no memories of him. According to his mother, his father left one morning to "buy diapers" and never returned.  Paul's father had another son of his own – Paul's half-brother Bobby, who was two years old at the time. He left Bobby with Adelaida as well. The family has not seen or heard from the boys' father since. Adelaida later had another son, Paul's half-brother Omar, whose father also did not stay. When Paul was nine, Adelaida had a third child – Paul's half-sister Alexandra.  Alexandra's father lived with the family and was both verbally and physically abusive. Punishments for minor misbehaviors were violent and cruel, including being beaten and locked in small rooms for days at a time. He recalls that he often stepped in to protect his mother from abuse which led to further violence between Paul and his stepfather. While he was still in elementary school, Paul's mother sent him to live with his maternal grandmother which was her solution to end violence in the home. Paul continued to reside with his grandmother and his maternal uncle who also lived there. His uncle was the closest thing to a father figure that Paul ever had.

Paul has a complicated relationship with his mother. He feels that he spent his childhood trying to protect her from abuse, but she did not reciprocate and was quick to send him away. His mother has never really acknowledged the abuse, instead attributing the violence to familial disharmony, much of which she blamed

---

[1] Rio Hondo, Texas - Wikipedia;  The Safest and Most Dangerous Places in Rio Hondo, TX: Crime Maps and Statistics | CrimeGrade.org

on Paul. His mother denied the abuse in her conversation with the US Probation
Officer, as noted in the PSR.

### 2.  Education, Employment, and Mental/Emotional Health

While living in Rio Hondo with his grandmother, Paul attended Los Fresnos
High School, but he did not receive his diploma. When asked why, Paul responded
with, "It's my own stupid fault, and I have no one to blame but myself." Such a
response is a testament to Paul's unyielding desire to take responsibility for his
actions, and it is no doubt a reflection of his conduct and character. But when
pressed for further information, Paul shared that he did indeed finish all his high
school courses. Just days before graduation, the principal (towards whom he held
lingering resentment from a past interaction) insisted that he had not completed
one credit. Rather than re-taking the course for credit, Paul let his pride get the
better of him and did not graduate with a diploma. He greatly regrets this decision
and has indeed paid a price for it as he continued into adult life with fewer
advantages and opportunities for employment.

Paul further explained that the conflict with the principal began during his
junior year when she forcibly cut his long hair, an incident that made the local
news, as confirmed by an archive search. Further research revealed that many
school districts in Texas have faced lawsuits over similar issues and are still under
scrutiny for what many believe are racially and gender discriminatory policies.[2]

---

[2] [Judge briefly blocks Texas schools' gender-based hair policy | AP News](#)
[How did hair become part of school dress codes? Some students see vestiges of
racism | U.S. | EL PAÍS English (elpais.com)](#)

*Images below are from a news article in the El Paso Times in August, 2006 which is specifically about the incident with Paul and other boys at his high school.*

## High-school principal cuts students' hair

**Associated Press**

LOS FRESNOS, Texas — Los Fresnos High School Principal Virginia Miller had an answer for several male students whose hair reached below their collars when they returned to school. She pulled a pair of scissors from her desk and gave them a trim.

About four boys needed to have their hair cut last week to meet the school's dress code, school district spokeswoman Birdie Rodriguez said.

The boys were given three options, including having their hair cut at school, Rodriguez said.

The other options are in-school suspensions for the rest of the day or a call home to have someone take them to get their hair cut. The options are listed in the school handbook given to the nearly 2,200 students, Rodriguez said.

Miller will continue to use her scissors if students come to school with hair too long and choose that option, Rodriguez said.

Nick Nieto, a sophomore, said he didn't expect to have his principal cut his hair.

"Right when I walked in, she said, 'Come with me,'" the 15-year-old told the newspaper. "She just said, 'Turn around.' I thought she was going to look at it, but she put a towel on my back and she cut my hair."

Nieto said his father didn't notice the haircut until Nieto told him about it. "He did get pretty mad," Nieto said.

A couple of parents said they see no problem with Miller's keeping students in line as long as parents are consulted. "She should call me first; then I know what to do," said Jauny Ramsey, the mother of a 14-year-old boy.

"The kids should have said, 'Let me call my parents.' They didn't cut their hair against their will," said Rossana Bogorad, who supports the school's decision.

Roy Morris, a junior, said that he tried to take in-school suspension but that Miller insisted on the other choice. "She just said basically, 'I want to cut your hair,'" Morris said.

From a young age, Paul always dreamed of leaving Rio Hondo to build a better life. However, without a high school diploma, work experience, or savings, this was a challenging goal. Despite these obstacles, Paul made several attempts to change his circumstances.

In 2012, he moved to Arizona and began training horses – a skill he learned from his uncle - in exchange for room and board. He then relocated to North Carolina, working as a laborer in logging and horse training, again for room and board, during which time he had to move back to Rio Hondo periodically between jobs. Unfortunately, this lifestyle offered no long-term prospects, and Paul eventually returned to Rio Hondo in 2015 and moved back in with his grandmother.

Determined to improve his situation, Paul focused on earning his GED. After months of dedicated study, he passed History, English, and Science, but struggled

with Mathematics.  Around this time, Paul was diagnosed with attention deficit disorder and possibly bipolar disorder. He tried medication but stopped due to negative side effects, feeling he could manage his triggers without it. His mother, unaware of this diagnosis, denied mental health issues in the PSR.

In 2017 Paul's life took a dramatic turn for the better. Upon learning about job opportunities in Minnesota from a friend who lived there, he decided to make the move. Paul stayed with his friend while he searched for employment and eventually secured a position at Kerry Ingredients. This opportunity was a turning point in Paul's life and finally provided him the fresh start that he had always hoped for. He found a modest one-bedroom apartment and began working in the packing department at Kerry. Over time, Paul advanced to become a certified machine operator and an instructor for forklifts and main lifts.

### 3.  Self-improvement and community contribution

When Paul was hired at Kerry Ingredients, he resolved to make the most of his good fortune and focus on self-improvement. In addition to working full-time, he continued studying for the math section of his GED, despite having failed the test three times.  Paul describes himself as a "slow learner," but he is encouraged by his improving scores and remains determined to pass, no matter how many attempts it takes.

In addition to his personal goals, Paul sought to give back to the community. Since early in his employment in 2017, Paul has been teaching English to his co-workers, many of whom are migrants with limited English skills. He uses his

breaks to offer free English lessons and engages in conversational practice while working on the floor.  He even creates color coded English/Spanish worksheets which he leaves in the break room. Aside from this, he visits his co-workers' home on the weekends to provide lessons free of charge.  He asks for nothing in return, believing that he gains as much as he gives.

To say that Paul is well-liked in the workplace would be an understatement, as can be seen from his co-workers' letters to the Court. His employer loves having Paul at the workplace, not only for his solid work performance, but for the enrichment Paul has brought to the entire work community by teaching the employees to speak English. Paul has been honest and upfront with his boss and his co-workers and has informed him that he will likely be leaving to serve time in prison. Paul's employer hopes that he is able to re-hire Paul after he is released and plans to do so if possible.

### 4.  Criminal History and drug/alcohol use

Paul's prior convictions are all misdemeanors stemming from traffic infractions.  He is in a criminal history category 1 and for good reason. While these convictions indicate lapses in judgment, they do not suggest a propensity for recidivism. Aside from January 6th, Paul has been a law-abiding citizen. His personal and professional life are on a highly positive trajectory, making it very unlikely that he would backslide and risk losing all that he has worked so hard for.

Paul does not use drugs or alcohol. He experimented with marijuana in high school, and the last time he used it was in 2017.  He does not consume alcohol, not even socially.

### B. The Nature and Circumstances of the Offense

Mr. Orta attended an earlier Trump rally in Minnesota. That was the only other rally he had ever been to.  While at that rally, he met a few people and exchanged phone numbers.  He considers these people to be acquaintances, not close friends. When some of those people began organizing a trip to attend the January 6th rally, Mr. Orta decided to ride along. He wanted to attend the January 6th rally for the purpose of hearing the then president speak for what he believed would be the last time. He is not a part of any extremist groups. He did not know what would later transpire and he certainly had no plans to storm the Capitol.

After checking into a hotel on the afternoon of January 5th, Mr. Orta and his travel companions – having never been to D.C. before - decided to explore the city. As they left the hotel, they noticed a brightly painted bus in the parking lot (which later became known as the "Hippies for Trump bus") attracting a large crowd. Opting for a ride on the bus instead of walking, Mr. Orta and his companions joined the group, despite not knowing anyone on board. The bus only traveled a few blocks before it was stopped by law enforcement. Several individuals on the bus were arrested for possession of weapons, but Mr. Orta was released as he had done nothing illegal and was not associated with anyone on the bus. Mr. Orta was aware that some individuals on the bus had weapons, as they made no effort to conceal

9

them.  This made him uneasy, and he recalls expressing his discomfort to the other passengers.

The following day, Mr. Orta attended the Trump rally wearing a tactical style vest.  Despite how it looks, he did not dress this way with the intention of going to the Capitol or engaging in violence.  Prior to the earlier rally he had attended, he'd been forewarned about potential clashes between protestors and counter-protestors. At that time, he purchased the vest ahead of that earlier rally as a precaution. He wore the vest to that rally, and although it hadn't proved to be necessary (that rally was peaceful), he wore the same vest on January 6th for the same precautionary reasons.

The government may highlight that Mr. Orta carried a hand-held radio.  This radio was loaned to him by the people he traveled with to D.C.  They anticipated a large crowd at the rally and had heard that the heavy use of mobile devices might disrupt cellular service.  Mr. Orta was not involved in any radio frequency communications, nor was he a part of any coordinating, organizing, or pre-planning activities.  In fact, Mr. Orta only turned the radio on once to play with it but couldn't figure out how to use it.

While Trump was still speaking, Mr. Orta saw several large groups of people leaving the rally early and walking toward the Capitol. He made the foolish decision to follow them.  Mr. Orta does not wish to offer justifications for his actions after this point. He does not believe any justification exits. He is deeply ashamed and remorseful not only of his specific actions, but of his presence on Capitol grounds on

January 6th.  He feels that any attempt to "explain it away" would minimize his contrition.  The defense however, asks the Court to consider in its deliberation what Mr. Orta did *not* do that day. He did not bring or use any weapons, he did not enter the Capitol building, he did not cause physical harm to anyone, and he did not post or brag about his actions on social media (neither on January 6th nor after).

Unlike many January 6th defendants, Mr. Orta's remorse was immediate.  He didn't wait to feel guilty after watching the news. He didn't wait to feel shame after being arrested. He knew he had broken the law; he knew that he had interfered with law enforcement.  While on Capitol grounds, he recalls a moment later in the afternoon when he looked at the crowd around him and knew that everything was wrong, and that the entire day had been one long horrible event. He left Capitol grounds, found his companions whom he had been separated from earlier, and drove back to Minnesota that same night.

### C. Mr. Orta's Act of Surrender and Level of Cooperation Warrants a Significant Downward Variance

Mr. Orta has received a two-level reduction in his sentencing guidelines for acceptance of responsibility for his guilty plea.  Because his offense level is low, he is not entitled to a third level reduction. This is no different than that subset of the 900+ other January 6th defendants who have also pleaded guilty but not of violent offenses.[3] But few others have voluntarily turned themselves in to the FBI *prior to even being contacted* by law enforcement. As this Court is aware, there is no further

---

[3] As of September 18, 2024, 940 January 6th defendants had pleaded guilty. Explore NPR database of Jan. 6 Capitol riot cases and sentencing status updates : NPR

reduction for this under the guidelines, though surely such an action demonstrates a far greater level of contrition than simply pleading guilty.

Following January 6th, Mr. Orta saw his picture on the FBI wanted list. Already burdened with guilt over what had happened, this solidified his decision to surrender. Anticipating immediate detention, he made arrangements for his living situation: He found a home for his dog Lucy, boxed up his apartment, and handed his keys to a friend to ensure his belongings could be moved out before the end of the month, knowing he wouldn't be able to pay rent once incarcerated. On January 25th, just 19 days after the offense, Mr. Orta had a friend drive him to the Minneapolis FBI field office to turn himself in. He did not bring an attorney with him, nor had he contacted an attorney prior to going to the FBI Office. Upon arriving, he identified himself in the photo and voluntarily gave an interview, openly discussing his actions at the Capitol. To Mr. Orta's surprise, he was not detained. He provided his name, phone number, address, and email address and was told that someone would be in touch with him.

Mr. Orta waited anxiously for nearly three years without a hearing from the FBI. During this time, he gradually unpacked his belongings but never truly settled back in. He constantly worried about how he would pay rent and what would happen to his dog when he was arrested. The inability to plan for these uncertainties caused him significant anxiety and worry.

The FBI finally obtained a warrant for his arrest on November 13th, 2023. That very same day, before the arrest was executed, Mr. Orta was stopped by a

local officer for a broken headlight as he was pulling up to his apartment after driving home from work.[4]  Upon checking his driver's license, the officer discovered the warrant and followed protocol by calling it in.

After another local officer was dispatched, they were instructed to wait with Mr. Orta until they received further instructions from the FBI.  But it seems that Mr. Orta was not a high priority, because the FBI never showed up. The local officers waited with Mr. Orta for over an hour. Clearly not threatened, they never handcuffed him. They allowed him to let his dog outside as she had been alone for several hours. As they waited outside without any response from the FBI, one of the officers mentioned feeling cold. Mr. Orta invited them into his apartment to stay warm where they spent over thirty minutes playing with his dog and engaging in friendly conversation. At one point, the responding officer even offered to take care of the dog in the event that Mr. Orta would be detained. Finally, after midnight and with the officers' shifts coming to an end, they were advised to take Mr. Orta to the Blue Earth police department where he would spend the night.  Before getting into the vehicle, Mr. Orta presented his wrists to the Officer, but seeing no need to handcuff him, the officer declined. The entire event speaks to Mr. Orta's character and kind demeanor. It highlights his level of cooperation and is a testament to the type of person he is. The responding officer clearly agreed, as can be seen in the body cam video and the police report.

> *"Orta was extremely respectful and very calm. Because of this when he asked to be able to let his dog out incase[sic] he was going to be arrested I*

---

[4] Arrest BWC was provided to and reviewed by defense.

*allowed him to do so… While we waited on the warrant confirmation Orta and I discussed potential care for his dog. I offered to Orta that I was willing to assist with the dog if his friend could not but that would require me to enter his home while he was in custody. Orta was ok with that and thanked me for being willing to do so…"*

## IV.   Objections to the PSR

### A.  **Mr. Orta qualifies for the "zero-point offender" adjustment**

Effective November 1, 2023, the United States Sentencing Commission

created a new guideline provision relating to criminal history at U.S.S.G. § 4C1.1,

Adjustment for Certain Zero-Point Offenders. Section 4C1.1 provides for a two-level

decrease from the offense level for defendants who did not receive any criminal

history points so long as they meet the following criteria:

1. the defendant did not receive any criminal history points from Chapter Four, Part A;
2. the defendant did not receive an adjustment under §3A1.4 (Terrorism);
3. the defendant did not use violence or credible threats of violence in connection with the offense;
4. the offense did not result in death or serious bodily injury;
5. the instant offense of conviction is not a sex offense;
6. the defendant did not personally cause substantial financial hardship;
7. the defendant did not possess, receive, purchase, transport, transfer, sell, or otherwise dispose of a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;
8. the instant offense of conviction is not covered by §2H1.1 (Offenses Involving Individual Rights);
9. the defendant did not receive an adjustment under §3A1.1 (Hate Crime Motivation or Vulnerable Victim) or §3A1.5 (Serious Human Rights Offense); and
10. the defendant did not receive an adjustment under §3B1.1 (Aggravating Role) and was not engaged in a continuing criminal enterprise, as defined in 21 U.S.C. § 848;

U.S.S.G. § 4C1.1(a); see also United States Sentencing Commission, Amendments to

the Sentencing Guidelines (Apr. 27, 2023), at 87-88 (Part B, Subpart 1).

14

The Zero-Point Offender applies to Mr. Orta. He has no criminal history points and none of the exceptions apply to his conduct. The government concedes that he has no criminal history points but opposes the two-level reduction because the government alleges that Mr. Orta used violence or credible threats of violence in connection with the offense. He did not. While there was violence that day, Mr. Orta did not himself engage in violence or threaten violence. And that is what matters.

The Sentencing Guidelines Manual itself does not define the term "use violence or credible threats of violence" within § 4C1.1 or its commentary.  And when no definitions are provided, courts look to dictionary definitions to determine meaning.  *See Kaufman v. Nielsen*, 896 F.3d 475, 485-87 (D.C. Cir. 2018).  Courts in this district have issued several opinions discussing dictionary definitions of violence when considering § 4C1.1 and found that violence is "'[t]he use of physical force, typically 'accompanied by fury, vehemence, or outrage,' and 'unlawfully exercised with the intent to harm'" or the "exertion of any physical force so as to injure or abuse."  *Bauer*, 2024 WL 324234, at *2 (*quoting* Violence, Black's Law Dictionary (11th ed. 2019), and Violence, Webster's Third New International Dictionary (1993)); *see also United States v. Yang*, No. 23-cr-100 (JDB), 2024 WL 519962, at *4 (D.D.C. Feb. 9, 2024) (similar); *United States v. Hernandez*, No. 21-cr-445 (CKK), ECF No. 65 at 5 (D.D.C. Jan. 31, 2024) (similar). There is no evidence that Mr. Orta had any fury or vehemence, nor did he exert force as to injure or abuse or intended to injure or abuse.

Courts in this District to have addressed the issue have found that §

4C1.1(a)(3)'s violence exception requires the defendant to have *personally* used violence or made credible threats of violence to be disqualified; it is simply not enough that Mr. Orta was part of a group where *others* engaged in violence or made credible threats of violence.  *See, e.g.*, *Yang*, 2024 WL 519962, at *4 (rejecting the government's violence-by-presence theory of § 4C1.1(a)(3) after finding the "inquiry turns on the actions of the defendant himself or herself, not the actions of others," and "join[ing] the view of at least six other judges in this District," including Judges Kollar-Kotelly, McFadden, Friedrich, Mehta, Howell, and Boasberg).  *See also*, *U.S. v. Joshua Doolin*, 21-CR-447-3 (CJN) Dkt. 313, adding Judge Nichols to the list of judges who concur.

Judge Bates' decision in *Yang* is instructive.  There, Mr. Yang "stood near the front of the crowd close to the police line" in the Rotunda.  *Yang*, 2024 WL 519962, at *1.  While Mr. Yang's "body language was generally nonconfrontational," he made "physical contact with officers twice."  *Id.*  First, "[w]hen a scuffle broke out nearby . . . Yang briefly grabbed an officer's wrist."  *Id.*  Second, "[w]hen an officer approached from the side and pushed [another rioter] firmly with a baton, Yang . . . briefly grabbed the baton as [the other rioter] fell backward."  *Id.*[5]

---

[5] According to the government's sentencing memorandum, "When police officers formed a line to expel the rioters from the Rotunda, Yang refused to move back or to leave, and instead, obstructed the officers. Yang pushed back and physically grabbed the arm of one officer, and when another officer pushed Yang towards the exit, Yang confronted the officer and waved his hand in his face instead of leaving. He remained near the advancing police line, and when an officer used his baton to push another rioter back, Yang physically grabbed hold of that officer's baton and interfered with the officer's attempt to clear the Rotunda. Yang finally exited the U.S. Capitol building at approximately 3:15 p.m., having been inside for roughly 30 minutes."  *Yang*, No. 23-cr-100, ECF No. 34 at 2.

The government included the following still photographs in its sentencing memorandum, ECF No. 34 at 11:



Image 8: Still from Government Exhibit 2 at 3:07:26 p.m., Showing Yang Grabbing Hold of the Wrist of a Police Officer Attempting to Push Rioters from the Rotunda.



Image 9: Still from Government Exhibit 2 at 3:07:26 p.m., Showing Yang Grabbing Hold of the Wrist of a Police Officer Attempting to Push Rioters from the Rotunda.

The government further represented that Mr. Yang "push[ed] back against the officers" and "remained at the front of the mob clashing with the officers," *id.* at 12:



Image 10: Still from Government Exhibit 1 Showing Yang Pushing Officers Working to
Expel Rioters from the Rotunda at Approximately 3:08:56 p.m.

Judge Bates concluded that Mr. Yang's actions did not constitute "violence"
within the meaning of § 4C1.1. *Yang*, 2024 WL 519962, at *4.  While Mr. Yang may
have used physical force in that "he briefly made physical contact with two officers,
the Court [found] that this contact was not made with an intent to harm." *Id.*  "Nor
was this contact accompanied by 'fury, vehemence, or outrage,' or the like." *Id.*  As
the Court explained, "[t]he throughline of the definitions of 'violence' is a degree of
aggressiveness that [wa]s not present in th[at] case." *Id.*  And, even though Mr.
Yang was "near the front of the line opposing the line of officers," and twice made
physical contact with officers, the Court concluded that "Yang did not act with the
degree of aggression necessary to fairly characterize his actions as 'violence.'" *Id.*

The same reasoning applies with even more force here.  When viewing Mr.
Orta's own conduct on January 6, he did not use "violence" as that term is properly

understood.  Mr. Orta did not punch, kick, grab, or throw any objects at law enforcement officers.  At no point did he damage property, threaten others, yell at anyone, or encourage others to use violence or even to push forward.  Given the indisputable fact that Mr. Orta did not engage in any acts of violence, the government appears to be advocating for a January 6th exception to the Guideline amendment.  Had the Sentencing Commission wanted such an exception they could have written it in as this amendment was promulgated years after January 6, 2021. They did not.

The "physical contact" enhancement that Mr. Orta agreed to in the plea agreement is far broader than § 4C1.1(a)(3): whereas § 2A2.4(b)(1) applies if "the *offense involved* physical contact," §4C1.1(a)(3)'s violence provision applies only if "*the defendant . . . use[d]* violence or credible threats of violence."  The contrast between these provisions' subjects (*i.e.*, "defendant" versus "offense") and the operative verbs ("use" versus "involves" or "results") makes clear that the inquiry of § 4C1.1(a)(3) "turns on the actions of the defendant himself or herself," unlike § 2A2.4(b)(1) which theoretically can consider "the actions of others."  *See Yang*, 2024 WL 519962, at *4 (D.D.C Feb. 9, 2024); *cf. United States v. Hernandez-Barajas*, 71 F.4th 1104, 1106-07 (8th Cir. 2023) (interpreting similarly-worded threats provision in U.S.S.G. § 2D1.1(b)(2) and concluding that the "sentence's subject, the doer of the action, is the defendant" and that "[g]rammatically speaking, the defendant is the one who must make the credible threat, even if it involves the potential use of violence by someone else"); *see also* U.S.S.G. § 2J1.2(b)(2) (applying 3-point

enhancement if "the *offense resulted* in substantial interference with the administration of justice"); *see also United States v. Hernandez*, No. 21-cr-455 (CKK), ECF No. 65 at 4 (D.D.C. Jan. 31, 2024) (finding an argument based on the "2J1.2(b)(1)(B) enhancement . . . not persuasive because it is not focused on Defendant's conduct, which is the relevant inquiry" under 4C1.1).

### B. While the "physical contact" enhancement applies, it overstates Mr. Orta's culpability

Pursuant to the plea agreement, Mr. Orta has stipulated that a three-level increase for "physical contact" under USSG § 2A2.4 (b)(1) applies. However, counsel submits that a downward variance is appropriate on these facts because a three-level enhancement overstates Mr. Orta's culpability. The three-level enhancement has been added due to Mr. Orta's conduct summarized in paragraph 31 of the PSR which reads as follows:

> *"Law enforcement attempted to form a police line and use metal bike racks to prevent the crowd from unlawfully advancing. At approximately 2:07 pm, over one hour after unlawfully entering the restricted grounds, Defendant Orta pushed against a bike rack barricade on the opposite side of a police line. Defendant Orta made physical contact with law enforcement officers during this forceful push. After pushing against the bike rack barricade, Orta then pushed against another rioter who was pushing against the bike rack barricade...."*

As accurately stated, at 2:07pm, Mr. Orta indeed pushed against a bike rack which was being held and supported by an officer standing on the opposite side. The bike rack made physical contact with the officer and Mr. Orta's actions were a direct cause of that. But Mr. Orta did not push an officer directly.

Less than one minute later, at 2:08pm, Mr. Orta pushed against another protestor who was leaning against a bike rack that was leaning against an officer. Again, Mr. Orta did not push an officer directly. The camera angle of the screenshot used as evidence to show the 2:08pm interaction [top image seen below] does not fully capture the protestor whom he's pushing up against, nor does it show the distance between Mr. Orta and the front line.



An alternate angle of this same incident (which fully captures the other protestor), provides a clearer picture of the distance between Mr. Orta and the line of officers.[6] Again, this image is only included to provide the Court with a better angle – it is not intended to contest Mr. Orta's guilt.

---

[6] Screenshot taken from mobile device video of a nearby defendant



Finally, the defense calls attention to the fact that each of the two incidents of "contact" lasted only a few seconds; and that Mr. Orta was only in close proximity to the front line for less than two minutes.  Of course the length of time does not absolve Mr. Orta of culpability, nor does it excuse his actions. It's only to say that it's less egregious than many other January 6th defendants who spent far more time – some of them several hours – at the front line.

Furthermore, "Physical contact" under 2A2.4 (b)(1)(A) can encompass a wide range of conduct. While no federal court has defined "physical contact" for purposes of 2A2.4 (b)(1)(A), the Seventh Circuit has explained that the meaning can "be derived by examining the law of battery." Battery is defined as "intentional and wrongful physical contact with a person." *United States v. Taliaferro*, 211 F.3d 412, 415-16 (7th Cir. 2000) (enhancement properly applied where inmate threw a cup of

urine in a prison guard's face) (internal citations omitted). The enhancement has been applied in contexts in which the defendant's contact with a victim was more aggravated than Mr. Orta's. For example, the Ninth Circuit upheld the application of the enhancement where the defendant kicked the victim correctional officer, causing him to lose his balance and hit his head. *United States v. Hill*, 996 F.2d 1228 (9th Cir. 1993); s*ee also United States v. Martinez-Alvarez*, 422 Fed. Appx. 356 (5th Cir. 2011) (affirming application of physical contact and bodily injury enhancements where defendant was convicted of assault on an officer and the assault caused painful swelling and bruising to the officer's knee and arms.). Here, where Mr. Orta made indirect contact, did not intentionally assault an officer, and did not injure an officer, the Court should vary downward because a three-level increase to the offense level overstates the nature of his conduct.

Should the Court apply the zero-point offender adjustment just a one-level variance because Mr. Orta's physical contact was indirect or not injurious, the total offense level would be 8, yielding a guideline range of 0 to 6 months.

## V.   A Below Guidelines Sentence will provide just punishment and achieve deterrence

Any incarceratory sentence longer than two weeks would cause Mr. Orta to lose employment and in turn, lose his apartment. Mr. Orta is fortunate that his employer is willing to hire him back in the future if possible, but of course it's not guaranteed. At any rate, Mr. Orta will certainly face challenges if wishing to pursue other professional avenues, and he will no doubt encounter other roadblocks due to his felony conviction.

Following any term of incarceration, Mr. Orta will continue to be monitored on supervised release with restitution obligations, which, to be clear, are in and of themselves forms of punishment. *See Mont v. United States*, 139 S. Ct. 1826, 1834 (2019) ("Supervised release is a form of *punishment* that Congress prescribes along with a term of imprisonment as part of the same sentence.") (emphasis added); *United States v. Haymond*, 139 S. Ct. 2369, 2380 n. 5 (2019) ("[T]he sword of Damocles hangs over a defendant every time he wakes up to serve a day of supervised release."); *Gall v. United States*, 128 S. Ct. 586, 595-96 (2007) (noting that even a non-custodial sentence imposes serious restrictions on one's liberty and constitutes punishment, not a "free pass"); *see also United States v. Cohen*, 459 F.3d 490, 496 (4th Cir. 2006) ("[R]estitution is […] part of the criminal defendant's sentence.").

The collateral consequences that attend to Mr. Orta's felony conviction cannot be overstated. District judges have recognized the life-long, damaging impact of a felony conviction can be relevant to sentencing. *United States v. Andrew Cavanaugh*, 21-cr-362 (APM), Sentencing Transcript at pg. 29. Similarly, in imposing a variant probationary sentence, Judge Frederic Block of the Eastern District of New York issued a written opinion on the relevance of collateral consequences to his sentencing determination and urged that judges "consider such consequences in rendering a lawful sentence." *United States v. Nesbeth*, 188 F. Supp.3d 179 (E.D.N.Y. 2016). Judge Block wrote:

> There is a broad range of collateral consequences that serve no useful function other than to further punish criminal defendants after they have

> completed their court-imposed sentences. Many—under both federal and
> state law—attach automatically upon a defendant's conviction. The
> effects of these collateral consequences can be devastating. … Myriad
> laws, rules, and regulations operate to discriminate against ex-offenders
> and effectively prevent their reintegration into the mainstream society
> and economy. These restrictions amount to a form of civil death and send
> the unequivocal message that "they" are no longer part of "us."

188 F. Supp. at 3d at 179 (internal quotations, alterations, and citations omitted).

In *Nesbeth*, the defendant was also a first offender, convicted of importation of

drugs. Though that defendant's guideline range was 33-41 months, Judge Block

"rendered a nonincarceratory sentence. . . in part because of the number of

statutory and regulatory collateral consequences in balancing the 18 U.S.C. §

3335(a) factors." *Id.* at 180. *See also United States v. Stewart*, 590 F.3d 93 (2d Cir.

2009) (despite guidelines of 78-97 months, district judge imposed sentence of twenty

months in part because conviction "made it doubtful that the defendant could

pursue his career as an academic or translator, and therefore that the need for

further deterrence and protection of the public is lessened because the conviction

itself already visits a substantial punishment on the defendant"); *United States v.

Pauley*, 511 F.3d 468, 474-75 (4th Cir. 2007) (loss of the defendant's "teaching

certificate and his state pension as a result of his conduct" is appropriate sentencing

consideration consistent with requirement that "the sentence reflect the need for

just punishment and adequate deterrence").

     With respect to deterrence, it is often presumed that incarceration is

necessary to achieve deterrence, and that the more incarceration imposed, the

greater the deterrent effect. However, research has consistently shown that while

the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects."[7] In short, there is little empirical support for the prospect that a period of confinement will be any more effective at deterring Mr. Orta or others from committing this offense.

### VI. A Below Guidelines sentence will avoid unwarranted sentencing disparities

#### A. Other Civil Disorder defendants have been shown leniency in sentencing due to special circumstances

As outlined previously, Mr. Orta's decision to surrender to the FBI demonstrates a significant level of acceptance of responsibility.  While the defense was unable to locate another January 6th defendant with identical circumstances

---

[7] Michael Tonry, Purposes and Functions of Sentencing, 34 Crime & Just. 1, 28 (2006) ("Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence."); see also National Institute of Justice, Five Things About Deterrence, at 1 (May 2016), https://www.ojp.gov/pdffiles1/nij/247350.pdf  (stating, among other things, that "[i]ncreasing the severity of punishment does little to deter crime," and "[t]he certainty of being caught is a vastly more powerful deterrent than the punishment"); Ellen Raaijmakers et al., Exploring the Relationship Between Subjectively Experienced Severity of Imprisonment and Recidivism: A Neglected Element in Testing Deterrence Theory, 54 J. of Rsch. in Crime and Delinq. 1, 4 (2017) ("[T]he available evidence points toward a null or a slightly criminogenic effect of imprisonment but has rarely found support for a clear specific deterrent effect."); Daniel S. Nagin, Deterrence in the Twenty-First Century, 42 Crime & Just. 199, 201 (2013) ("[T]here is little evidence of a specific deterrent effect arising from the experience of imprisonment compared with the experience of noncustodial sanctions such as probation. Instead, the evidence suggests that reoffending is either unaffected or increased."); Zvi D. Gabbay, Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity").

who has been sentenced on a felony charge, the following cases have been identified
as having special conditions that could be considered similar and should be
considered to avoid unwarranted disparities.

## United States v. Klete Keller (21-cr-104-RJL)

Klete Keller, a 6'6" former US Olympian entered the US Capitol where he
remained for over an hour. While inside, he stood near the Senate Chamber and
chanted "Fuck Nancy Pelosi!" and "Fuck Chuck Schumer!" He repeatedly resisted
officers' attempts to remove him from the building.  He had physical contact with
officers. When he finally left, due to deployment of chemical irritants by law
enforcement, he threw his jacket in the trash and destroyed his phone. Keller was
originally charged with Civil Disorder (231) as well as an additional felony charge
(1512).  He pleaded guilty to the higher charge. Like Mr. Orta, Keller self-
surrendered shortly after the offense. However, Keller only did so after his arrest
warrant was issued. Nevertheless, the government commended Keller by noting in
their sentencing memorandum that, "By September 2021, he was one of the first
people to plead guilty to the felony obstruction and one of the first people to publicly
agree to a cooperation plea agreement. For nearly three years, Keller has
cooperated with the government's investigation…"[8]  Mr. Orta would have liked to
have had the opportunity to do the same, and he certainly would have been
cooperative and pleaded guilty just as soon as Keller had. But Mr. Orta was not
given this chance.  When Mr. Orta tried to turn himself in (prior to any arrest

---

[8] Government Sentencing Memorandum, ECF 51.

warrant), he was turned away after giving a confession. While Keller was being applauded for his three years of cooperation, Mr. Orta was waiting and worrying. Klete Keller's sentencing guideline range was 21-27 months' imprisonment. The government asked for only 10 months. He was sentenced to 36 months probation with the special condition of 6 months home detention.

### United States v. Russell Taylor (21-cr-392-RCL)

Russell Taylor served on the board as a member of the American Phoenix Project, an extremist organization founded by his co-defendant which repeatedly called for violence prior to January 6th. Taylor himself organized the "California Patriots – Spec Ops" Telegram group to organize "Patriots that are ready to function as operators of disruption against Tyranny" with the goal "to remove authority." Taylor made plans to disable the vehicles of city workers in California and smash windows at Facebook's offices, all while disguising his actions as those of Antifa. Taylor also organized the "So Cal Patriots" in which he called for violence against political leaders, posting that the governor of California "needs to be drug out on the street," and that group members should "storm the California state capitol building." As January 6th approached, Taylor encouraged participants to attend and spoke of breaching the doors of the US Capitol while encouraging members to bring weapons. Finally, he started another group, "The California Patriots – DC Brigade" for those "that are traveling to DC for Jan 6th event that are comfortable with violence" and encouraged those group members to prepare for battle by collecting weapons. Taylor then gave a speech in D.C. on January 5th

encouraging violence. He went to the Capitol the following day wearing an exposed knife on top of a bullet proof chest plate and toted a backpack containing bear spray, a hatchet, and other weapons. He joined others in pushing against the police line defending the lower west terrace and then stayed in the area for hours until law enforcement forcibly pushed them out. Taylor was charged with Civil Disorder (231) as well as an additional felony charge (1512).  He pleaded guilty to the higher charge.  Taylor testified against a co-defendant, which was acknowledged in the government's sentencing memorandum.  The government asked for 52 months imprisonment, noting a 40% downward departure from the top of his guidelines for his cooperation.[9]  He was sentenced to only 36 months probation with the special condition of 6 months home detention. This defendant clearly played a large role in organizing violence, something that Mr. Orta certainly did not do.  Mr. Orta was not a part of any extremist groups, so even if he had been given a chance assist the government, he would not have known any information of this nature.

*United States v. Louis Enrique Colon (21-cr-160-TJK):*

Defendant Louis Enrique Colon, a first-degree Proud Boys member, traveled to the capital as part of a structured group that was prepared for violence. Along with other Proud Boys members and associates, he crossed the barricades at Peace Circle in the first wave of rioters to breach the restricted area, then spent over an hour on the west front and eventually entered the building where he obstructed police efforts by using a chair to prevent the automated doors from closing, an

_____

[9] Government Sentencing Memorandum, ECF 484

action that allowed the mob to advance further into other areas of the building. Colon carried a knife with him.  Colon was originally charged with Obstruction (1512) and Civil Disorder (231) but was allowed to plead guilty to the lower charge. The government only sought 24 months probation for a special circumstance, citing the following: "After being charged in this case, however, Colon has shown an unusual degree of acceptance of responsibility, as outlined in the government's sealed filing that accompanies this memorandum.  Accordingly, he deserves a sentence substantially lower than what the Court has imposed on co-defendants.[10]" The details of the "unusual degree of acceptance of responsibility" are unknown, but the defense submits that Mr. Orta also demonstrated an unusual degree of acceptance of responsibility by turning himself over to the FBI. Louis Colon was sentenced to only 24 months probation.

### B. Similarly situated Civil Disorder cases

The following defendants have been identified as having equally culpable, if not worse, conduct at the US Capitol than that of Mr. Orta. The cases below show that a below guidelines sentence would not create an unwarranted disparity even when considered among other Section 231 cases in which the defendant did *not* turn themselves in or show any unusually high degree of acceptance of responsibility.

<u>*United States v. James Russell Davis (21-cr-595-TJK):*</u>

Defendant James Davis pleaded guilty to Civil Disorder.  Like Mr. Orta, Davis arrived early to Capitol grounds, and he made physical contact with an officer

---

[10] Government Sentencing Memorandum, ECF 276

in a location on the west front near to Mr. Orta's location.  However, Davis's conduct was otherwise more egregious than Mr. Orta's in the following ways: Davis made *direct* contact with law enforcement and did so multiple times and with multiple officers; Davis carried a large wooden stick (which also made contact with at least one officer); and he verbally harassed multiple officers. But most notably different from Mr. Orta, Davis was a member of the Proud Boys, and prior to January 6th he posted messages to other members encouraging them to "prepare for battle," as well as encouraged violence against law enforcement, and finally called for violence at the rally by posting, "LET THE BODIES HIT THE FLOOR." While still on Capitol grounds, Davis posted about his actions within his Proud Boys chat group, bragging that he used his stick to force police to retreat.[11] Similar to Mr. Orta, Davis's calculated offense level was 11 with a sentencing guideline range of 8 to 14 months' imprisonment. This included a 10pt base level offense plus an additional 3pts (minus 2pts for acceptance of responsibility). However, Davis's 3pt. enhancement was "Physical Contact or Dangerous Weapon Used," even though Davis engaged in both direct physical contact using his hands *and* physical contact using a dangerous weapon. James Russell Davis was sentenced to two months incarceration, notwithstanding the government's recommendation of eight months.

### United States v. Timothy Hart (21-cr-540-PLF)

Defendant Hart was convicted of Civil Disorder for joining rioters to overrun barriers manned by police in the first breach of the Capitol grounds. He then

---

[11] Government Sentencing Memorandum, ECF 52

ignored the pepper spray around him and made his way into the building, where he remained for 22 minutes. While inside the Capitol, he smoked marijuana in the Rotunda.[12] The district judge imposed a sentence of 36 months probation notwithstanding the government's request for four months incarceration.

## United States v. Brian Preller (23-cr-45-TNM):

Defendant Preller, a member of the "Guardians of Freedom," an organization loosely affiliated with the Three Percenters, entered the Lower West Terrace "tunnel," where he confronted police officers and pushed against others pushing against the police line. Preller wore large googles, a helmet, and a tactical vest that carried what appeared to be a chemical irritant spray in the front. Following January 6, Preller posted several statements taking credit for January 6, 2021. For example, when someone asked him what he had been doing, he responded, "continuing to build my 3% army so I can overthrow the federal government."[13] The district judge rejected the government's request for eight months incarceration and instead imposed a sentence of 60 months' probation.

## United States v. Benjamin Cole (23-cr-113-TNM):

Benjamin Cole, a member of the Guardians of Freedom, joined in the lower west terrace "tunnel fight" by pushing against other protestors. Cole wore a tactical vest and carried a black expandable metal baton. Mr. Cole joined protestors in attempting to forcefully push through the police line at the tunnel entrance to the

---

[12] Government Sentencing Memorandum, ECF 69
[13] Government Sentencing Memorandum, ECF 90

Capitol. After January 6, Cole posted messages to his Facebook calling the FBI a "joke" and claiming that he did "absolutely nothing" at the Capitol. In stark contrast to Mr. Orta, the first time he was interviewed by the FBI, he denied coming near the Capitol.[14] For all of this, Cole was sentenced to 14 days of intermittent confinement.

*United States v. Richard Zachary Ackerman  (24-cr-60-TJK):*

According to the government, Richard Ackerman stole a U.S. Capitol Police Officer's helmet and wore the helmet throughout his time on Capitol grounds, including when he threw a water bottle at officers engaged in intense fighting with rioters on the Lower West Terrace. He then bragged about his actions in text messages sent to multiple people and referred to the stolen helmet as his "war trophy."[15] Ackerman pleaded guilty to Civil Disorder (231) and Theft of Government Property (641). The government sought the 3 level enhancement for physical contact. Ackerman's sentencing guideline range was 10-16 months imprisonment. He was sentenced to time served (which was two days) and 24 months probation, not withstanding the government's request for 10 months incarceration.

*United States v. Bernard Sirr (22-cr-259-TNM-1); United States v. Luke Lints (22-cr-259-TNM-2):*

Bernard Sirr and Luke Lints are examples of individuals with cases similarly situated to Mr. Orta. Each had an identical 8 to 14-months agreed-to Guideline

---

[14] Government Sentencing Memorandum, ECF 86
[15] Government Sentencing Memorandum, ECF 34

range following their pleas to Civil Disorder. Each received sentences well below that range. But the actions of both defendants were more egregious than that of Mr. Orta. For example, Sirr was a member of his local Proud Boys chapter who drove to Washington D.C. with his fellow extremists. Prior to January 6th, Sirr posted several threatening tweets alluding to violence against members of the government, and on January 6th, he was at the front of the group of rioters in the tunnel pushing against police officers who were guarding the Capitol. Sirr was eventually repelled; however, he remained on the grounds and videoed the attack on an officer before attempting to enter the tunnel for the second time. Sirr admitted to the FBI that he attended the rally and tried to enter the Capitol, but lied about his intentions that day and fabricated his reasoning for attempting to enter the tunnel a second time.[16] Sirr was sentenced to two months of incarceration and 12 months of supervised release.

Lints attended the "Stop the Steal" Rally with his mother, after which the two made their way to the Capitol. On the way, Lints's mother fell ill and was taken to the hospital via ambulance. Instead of accompanying his mother to the hospital, Lints continued his march on the Capitol, entered the restricted grounds and made his way onto the Lower West Terrace. Lints was in the same tunnel as Sirr and similarly made his way to the front of the rioters. There, Lints stole a police shield from officers and proceeded to use it in a coordinated push against the officers. He stole a second and third shield, and continued to use police gear against the officers

---

[16] Government Sentencing Memorandum, ECF 53

until he was forced from the tunnel. After January 6th, Lints was unremorseful, posting falsehoods on social media, minimizing his conduct, and calling the police the aggressors.[17] Lints was sentenced to 4 months of incarceration, 4 months of home detention, followed by 36 months of supervised release.

### United States v. Stephanie Hazelton (21-cr-00030-JDB):

Stephanie Hazelton entered the Lower West Terrace Tunnel three times, all the while leading and urging other rioters forward and pushing forward against police officers. Hazelton pushed towards the front of the crowd and confronted the officers as they were assaulted with poles and batons. She was in one of the first groups to enter the tunnel, and she urged others forward and called for more men to join the push. In the days following January 6, Hazelton took to Facebook Messenger to boast about her conduct at the Capitol and state her intent to do it again. In subsequent messages, she told of erasing content of the events from her phone.[18] Hazelton had an identical 8 to 14-months Guideline range following her plea to Civil Disorder. She was sentenced to 10 days of incarceration and 24 months of supervised release.

### United States v. Anthony Nolf (23-cr-162-BAH):

Defendant Anthony Nolf pleaded guilty to Civil Disorder and had the same guideline range as Mr. Orta which included a three-level enhancement.  Like Mr. Orta, Nolf arrived early to Capitol grounds and moved barricades off to the side and

---

[17] Government Sentencing Memorandum, ECF 58
[18] Government Sentencing Memorandum, ECF 56

then had indirect physical contact with officers (though he did so in the tunnel on the northwest terrace).  But this defendant's conduct was also otherwise more egregious than Mr. Orta's. For example, Nolf brought his 15-year-old son into the tunnel with him, and then only left the area when protestors were forcefully pushed out by law enforcement after 5pm. He later lied to the FBI about his conduct and was initially not remorseful.[19]  He was sentenced to three months incarceration followed by 36 months probation.

*United States v. Geoffrey Shough (22-cr-197-DLF):*

Defendant Geoffrey Shough, a former Department of Defense contractor, wore tactical gear to the Capitol. According to the government, he was "one of the first individuals in a large group that pushed through, violently overwhelmed, and made physical contact with a line of uniformed officers during the second breach of the Senate Wing Door; repeatedly encouraged officers to stand aside, and remained inside for approximately 15 minutes."[20]  Shough's guideline range was 8-14 months incarceration which included the three-level enhancement for physical contact. This Court sentenced Shough to six months incarceration notwithstanding the government recommendation of 11 months incarceration. Mr. Shough was sentenced before the enactment of 4C1.1 so no arguments regarding that reduction were made in the sentencing memoranda.

*United States v. Daryl Johnson (21-cr-407-DLF-1);* and *United States v. Daniel Johnson (21-cr-407-DLF-2):*

---

[19] Government Sentencing Memorandum, ECF 63
[20] Government Sentencing Memorandum, ECF 33

Case 1:24-cr-00146-DLF   Document 27   Filed 09/23/24   Page 37 of 38

According to the government, Daryl and Daniel Johnson climbed into the Capitol through a broken window and remained inside the building for 26 minutes. While inside, they joined a group of rioters in rushing and shoving aside several U.S. Capitol Police offers who were guarding the East Rotunda doors from a mass of additional rioters gathered outside. They then joined others to push against the police line, sandwiching the officers against the doors. The day after January 6th, Daryl Johnson posted on Facebook, "… Mark my words Yesterday will be the beginning of the revolution… what happens when those same people decide to throw out the 'elected officials.' It will be hangings on the front lawn of the Capitol – that crowd is not messing around."  On February 7th, he posted, "Bring it on Biden! I have no problem dying in a pool of empty shell casing."  Daniel Johnson also bragged about his actions on social media, and in a Snapchat conversation admitted that he was trying to find a way into the Senate chamber.[21]  Both defendants pleaded guilty to Civil Disorder, but neither were given the three-level physical contact enhancement despite the fact that they, like Mr. Orta, indirectly pushed officers. Daryl Johnson, with no significant criminal history, was sentenced by this Court to 30 days incarceration followed by 12 months probation (government recommended 90 days); and Daniel Johnson, a criminal history category II, was sentenced to four months incarceration followed by 12 months probation. These sentences were both imposed prior to the new 4C1.1 guideline.

---

[21] Government Sentencing Memorandums, ECF 57 and ECF 58

**VII.   Conclusion**

For the reasons stated above, Mr. Orta respectfully requests a below guidelines sentence along with payment of the $2,000 restitution. Given his high level of contrition, his cooperation, and his history and characteristics, as well as his compliance with release conditions, Counsel asks the Court to consider a significant downward variance, to a non-custodial sentence or one of intermittent confinement to avoid interruption to Mr. Orta's employment.

Respectfully submitted,

A. J. KRAMER
FEDERAL PUBLIC DEFENDER

/s/

MICHELLE M. PETERSON
Chief Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500
Shelli_Peterson@fd.org