**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 24-cr-00146-DLF** |
| **PAUL ORTA, JR.,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Paul Orta, Jr. to 12 months' incarceration, three years of supervised release, restitution in the amount of $2,000, and a special assessment fee of $100.

### I.    INTRODUCTION

The defendant, Paul Orta, Jr., participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts,

As explained herein, the government's recommended sentence is appropriate in this case. Orta prepared for violence on January 6, 2021. He was stopped on January 5 in a vehicle containing multiple weapons, and he equipped himself on January 6 with a carrier vest and other tactical gear. Orta was at the front of the crowd of rioters as they overwhelmed officers at Peace Circle. When inside the restricted area, Orta threw black metal barricade on the ground and beckoned for rioters to move forward. He continued with the crowd charging up Pennsylvania Walkway and cheered "We're taking that shit today!" Orta then removed at least two sections of bike rack and threw them over a brick wall. He continued to the West Plaza, where he threw a body worn camera towards the police line and pushed against bike rack and a line of officers.

The government recommends that the Court sentence Orta to 12 months of incarceration for his conviction of violating 18 U.S.C § 231. A 12-month sentence reflects the gravity of Orta's conduct, but also acknowledges his early admission of guilt.

## II.   FACTUAL BACKGROUND

### A.   The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, ECF 21, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

---

but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

**B.      Orta's Role in the January 6, 2021 Attack on the Capitol**

***Travel to and in Washington, D.C. on January 5***

On or about January 5, 2021, Orta traveled from Minnesota to the Washington, D.C area. Hotel records indicate he checked into a hotel in Oxon Hill, Maryland. That same day, in response to a tip from a concerned citizen, officers from the Prince George's County Police Department responded to the hotel and executed a traffic stop on a privately-owned school bus with North Carolina plates that was covered in Trump 2020 graffiti. Orta and three other individuals were on the bus; they were patted down for weapons and released.

Later that afternoon, the Metropolitan Police Department (MPD) stopped the same bus covered in graffiti in the 700 block of Constitution Avenue in Washington, D.C. Orta was one of seven individuals on the bus. Law enforcement discovered multiple weapons—a 9mm pistol, four loaded 9mm magazines, a .22 caliber rifle, 275 rounds of .22 caliber ammunition, and a 110 round .22 caliber drum magazine aboard the bus. Orta was searched and released as part of the incident.[2] Image 1 is a screenshot of an open-source video, attached as Exhibit A, of Orta and others describing the stop and police recovery of weapons.

---

[2] The owner of the bus was subsequently arrested by MPD on multiple weapons charges. The driver of the bus was arrested for not having a permit to operate a motor vehicle in the District of Columbia.



*Image 1: Orta, at 1:02 of Exhibit A, acknowledged weapons were found on the bus on January 5.*

### Approach to the Capitol on January 6

On January 6, 2021, Orta was dressed in a black balaclava, black hooded jacket, brown/green tactical gloves, a green tactical carrier vest with a Texas-shaped flag patch, and blue jeans. He carried a black handheld radio. As shown below in Image 2, Orta watched some of the events in the morning from the top of a pillar near the Ellipse.



*Image 2: Orta, circled in red, with others early in the day on January 6.*

4

By approximately 12:30 p.m., although President Trump was still speaking at the Ellipse, Orta and others began to travel in the direction of the Capitol. As shown in body worn camera at Image 3 and open-source video at Exhibit B at 1:42 to 2:40, Orta and others yelled at police and followed them down a side street.



*Image 3: Orta, circled in red, confronting MPD as they redirect the crowd.*

Officers directed the crowd to back up and move along Pennsylvania Avenue.

### Breach at the Police Line and Barricades at Peace Circle

At approximately 12:53 p.m., Orta was part of the crowd on the west side of the Capitol along First Street. The crowd overwhelmed officers at the Peace Memorial entrance and began to move onto Capitol grounds. Individuals in the crowd assaulted officers and knocked over barricades.

Just inside the barricades, as shown in Exhibit C at 0:43 to 1:12, Orta threw a section of black metal barricade onto the ground and beckoned to the crowd to move forward. Images 4 and

5 below are taken from Exhibit C and show Orta moving the black metal barricade and gesturing to the crowd.

 

*Images 4 and 5: Orta moving black metal barricade immediately inside the restricted area and gesturing to other rioters.*

Orta then moved with the crowd as they rushed unlawfully onto restricted grounds up the Pennsylvania Walkway toward the Capitol. USCP officers retreated and attempted to re-establish a new police line to stop the approaching crowd. As Orta advanced up the walkway toward the Capitol and the retreating USCP officers, he yelled, "We're taking that shit today!" Exhibit D at 6:46 to 7:40.

Approximately two minutes after unlawfully entering Capitol grounds, Orta forcefully moved temporary bike racks that were being used by law enforcement officers to control the crowd. Specifically, Orta removed at least two sections of the bike racks and threw them over a concrete wall, as shown in Exhibit D and Images 6 and 7 below.



*Image 6: Screenshot of Exhibit D at 7:08 when Orta picks up bike rack barricade.*



*Image 7: Screenshot of Exhibit D at 7:28 before Orta throws barricade over the wall.*

### ***Orta Throws Object and Pushes Against Officers in West Plaza***

Orta continued to move forward with the crowd as it again overwhelmed USCP officers and entered the West Plaza of the Capitol. At approximately 1:00 p.m., Orta made his way to the front of the crowd on the West Plaza.

By approximately 1:22 p.m., law enforcement began to push the crowd back away from the Capitol. As shown in Image 8 below, Orta pitched a police body-worn camera over the heads of other rioters and towards a crowd of law enforcement officers.

8



*Image 8: Orta, circled in red, preparing to throw the body worn camera to the police line.*

By approximately 2:07 p.m., law enforcement officers re-formed a police line and used metal bike racks to prevent the crowd from unlawfully advancing past the police line and towards the U.S. Capitol building. The officers were wearing full uniforms and, in some cases, body armor and helmets. Nonetheless, after having already spent more than an hour unlawfully on the restricted grounds, Orta pushed against a bike rack barricade manned by police officers. While forcibly pushing, Orta made physical contact with law enforcement officers as shown below in Image 9 and Exhibit E from 00:39 to 00:50.



*Image 9: Screenshot from body worn camera at Exhibit E at 00:42 showing Orta pushing against the bike rack barricade.*

About a minute later, after pushing against the bike rack barricade, Orta then pushed against another rioter who was pushing against the bike rack barricade, as shown below in Image 10 and Exhibit E from 1:40 to 1:54.



*Image 10: Orta, circled in red, at 1:40 of Exhibit E as he joined with rioters to push against the police line.*

Shortly thereafter, the crowd on the West Plaza broke through the police line protecting the West Plaza and officers were forced to retreat into the U.S. Capitol building.

After the crowd had breached the police line and pushed its way to the Lower and Upper West Terraces, Orta celebrated by climbing on top of a concrete wall and raising his fist in the air, as shown in Exhibit F at 00:38 to 00:49 and Image 11 below.



*Image 11: Orta, circled in red, raises his fist in celebration.*

### *Orta's Interview with the FBI*

On January 25, 2021, Orta went to the FBI Minneapolis Field Office. He said he called the prior day, on January 24, 2021, but the office was closed because it was a Saturday. Orta said he went to the FBI Office because he saw his photo on the FBI website and "wanted to do the right thing." Orta used his phone to navigate to the FBI website and identified himself as the individual in Photograph #148 – AFO. Agents were not in a position to conduct a pointed, confrontational interview, but listened to Orta and memorialized what he told them.

Orta expressed that he felt guilt and shame about his involvement in the riot on January 6, 2021. Orta said he was about 15 feet away from the door to the Capitol and decided he did not want to go any further. He acknowledged that he had gone past the "first barrier" but claimed he did not go past the "second barrier." Significantly, Orta also claimed that he could not recall if he was yelling anything or if he threw anything or hit anyone. PSR ¶ 34. When asked other detailed questions about his involvement on January 6, Orta said he did not remember. Orta said that he deleted all his photos and videos from January 6, explaining that he was scared. Orta told agents he wanted to speak to a lawyer, and the agents ceased asking questions and provided him with the phone number for the local Federal Defender's office.

## III.   THE CHARGES AND PLEA AGREEMENT

Orta was charged by complaint on November 13, 2023 with civil disorder, in violation of 18 U.S.C. § 231(a)(3), entering or remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1), and disorderly and disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2). He was arrested on November 14, 2023. The government extended a plea offer to Orta in February 2024, and the parties reached agreement in March 2024. On May 14, 2024, Orta pleaded guilty to a one-count information charging Orta with a single count of civil disorder, in violation of 18 U.S.C. § 231(a)(3), based on a guilty plea entered pursuant to a plea agreement.

## IV.   STATUTORY PENALTIES

Orta now faces sentencing on civil disorder.

As noted by the plea agreement and the Presentence Report issued by the U.S. Probation

Office, the defendant faces up to five years imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, restitution, and a mandatory special assessment of $100.

## V.   THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. Section 4C1.1 does not apply in this case because the defendant used violence or a credible threat of violence against people or property under a totality of the circumstances analysis. Violence was defined by Judge McFadden as "[t]he use of physical force," typically "accompanied by fury, vehemence, or outrage" and "unlawfully exercised with the intent to harm." Judge McFadden also defined it as the "exertion of any physical force so as to injure or abuse." *United States v. Bauer*, No. 21-cr-386-2 (TNM), ECF No. 195 at 4-5; *see also United States v. Hernandez*, No. 21-cr-445 (CKK), ECF No. 65 at 5 (adopting Judge McFadden's definition of violence from *Bauer*). Here, among other things, Orta physically threw a body worn camera at officers and pushed up against a bike rack barricade on the opposite side of a police line. As shown in the video at Exhibit E, Orta made physical contact with the officers during the push, and he then pushed against another rioter pushing against the barricade. At the time he aggressively pushed up against the barricade, the West Front looked like a battle scene, complete with an active melee and visible projectiles. Orta

demonstrated that he knew the importance of the barricades when he threw them to the side, which allowed rioters behind him to stream through the grounds earlier in the day. Nevertheless, Orta pushed on the bike racks to impede police attempting to sustain the perimeter. Approximately five minutes after Orta's pushing, the rioters successfully penetrated the area and the officers were forced to retreat. Thus, Orta "use[d] physical force" "with the intent to harm," and is not eligible for a reduction under § 4C1.1. *See* PSR ¶ 48.

Due to the unique nature of the January 6 mob, the harms caused by the January 6 riot, and the significant need to deter future mob violence, the government submits that even if the Court were to find that § 4C1.1 applies, the Court should nevertheless vary upwards by two levels to counter any reduction in offense level. Such treatment would recognize the unique nature of the criminal events of January 6, 2021, coupled with the overwhelming need to ensure future deterrence, despite a person's limited criminal history.

Finally, to avoid unnecessary litigation, if the court declines to apply § 4C1.1, the government requests that the Court make clear at sentencing that it would have imposed the same sentence regardless of whether § 4C1.1 applies.[3]

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 52. The government calculation of the defendant's total offense level, after

---

[3] U.S.S.G. § 5C1.1 has also been amended with a new application note providing that if a defendant receives an offense level reduction under § 4C1.1 and either their applicable guideline range is in Zone A or B of the Sentencing Table, or the guideline range overstates the seriousness of the offense, imprisonment may not be appropriate. *See* U.S.S.G. § 5C1.1, comment. n. 10. The government submits that for the same reasons that § 4C1.1 should not be applied in this case, a sentence of imprisonment is appropriate notwithstanding Application Note 10 to § 5C1.1.

acceptance of responsibility, is 11., Accordingly, Orta's Guidelines imprisonment range is 8 to 14 months' imprisonment. The defendant's plea agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation contained herein.[4]

## VI.     SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.     Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Orta's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Orta was stopped twice the day before and found on a bus with extensive weapons and ammunition. He therefore knew there was a potential for violence, and he prepared for it by wearing a carrier vest and other tactical gear. He was at the front of the crowd when the rioters marched up the Pennsylvania Walkway, where he flung barriers over a wall to prevent them from being used by officers to control the crowd. Orta then moved to the West Plaza, where he threw a body worn camera at the police line and forcefully pushed against a bike rack barricade. The nature and circumstances of Orta's offense were of the utmost seriousness, and fully support the government's recommended sentence of 12 months incarceration.

---

[4] The plea agreement states that Orta may be eligible for a reduction under § 4C1.1. *See* ECF 20 at 3. It further states that "[t]he parties agree that the burden is on the defendant to prove that the defendant satisfies all the criteria in § 4C1.1 to be eligible for an adjustment" and the government reserves the right to oppose application of the criteria for an adjustment. *Id.*

**B. The History and Characteristics of the Defendant**

Orta has worked at a food processing plant in Minnesota since 2017. PSR ¶¶ 82-83.

Although he does not have any criminal history points, the instant case is not his first charged offense. He was convicted of an offense in Cameron County, Texas in 2008 after being charged with making repeated harassing phone calls. PSR ¶ 57. He has also been convicted of several traffic infractions, including driving without a license, failure to obtain a license, no proof of insurance, and expired registration. PSR ¶¶ 53-56.

He has been compliant with the terms of pretrial release.

**C.     The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Orta's criminal conduct on January 6 was the epitome of disrespect for the law.

**D.     The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[5] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

---

[5] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

***Specific Deterrence***

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. Orta's troubling conduct on January 6 demonstrates the need for specific deterrence. He was at the front of the crowd and challenged officers throughout the day, beginning as he walked towards the Capitol, at Peace Circle, up Pennsylvania Walkway, and finally at the West Plaza. He removed barricades when rioters first entered the restricted area after overwhelming officers at Peace Circle. Those actions made it easier for the crowd to unlawfully advance and made it more difficult for officers to try to stop the approaching crowd. On the West Plaza, he threw a body worn camera at the police line and he forcibly pushed against a bike rack barricade. His actions there enabled rioters to break through the police line. Because his actions that day show a willingness to violate the law, threaten police officers, and engage in acts of disorder, his sentence must be sufficient to provide specific deterrence from committing future crimes.

### E.     The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity

courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.   Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*,

545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[6]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[7] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Narayana Rheiner*, 22-cr-103-DLF, the defendant was similarly at the front of the mob and confronted officers at multiple locations which enabled the crowd to advance. At approximately 2:15 p.m. on the Upper West Terrace, Rheiner encouraged rioters to "push up" against the police line. Rheiner grabbed an officer's riot shield and pulled it away from the officer,

---

[6] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[7] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

causing him fall down several steps to the ground. After entering the Capitol building, Rheiner and other rioters confronted officers near the Old Senate Chamber and he made physical contact with one of the officers. Like Orta, Rheiner pleaded guilty to a single count, a violation of 18 U.S.C. § 231(a)(3). Rheiner was sentenced to 15 months' imprisonment. However, because Rheiner had an extensive criminal record and Orta does not, a 12-month sentence for Orta would not create an unwarranted disparity.

In another instructive case, *United States v. Nolan Cooke*, 22-cr-00052-RCL, the defendant was also convicted under § 231 and also faced a Guidelines range of 8 to 14 months. Like Orta, Cooke never entered the Capitol building and stood at the front line of rioters who broke through the police barricade, albeit on the East side of the building. In one instance, he similarly grabbed a bike rack and pushed it against the police line. Whereas Orta threw the body worn camera at officers, Cooke struck a previously broken window with a pole. Orta's conduct was more troubling than Cooke's because Orta removed barricades as rioters entered the restricted area, which encouraged and aided other rioters to enter the restricted area. Like Orta, Cooke had no criminal history. The government requested an 11-month sentence for Cooke and the Court sentenced him to a year and a day.

Like Cooke, the defendant in *United States v. Roger Baugh*, 22-cr-313-JEB, was convicted under § 231, faced a Guidelines range of 8 to 14 months, and the Court sentenced him to a year and a day. The government acknowledges that Baugh lied to the government in an interview with the FBI and a subsequent interview with an Assistant United States Attorney and United States Capitol Police. Nevertheless, a comparison of multiple § 3553(a) factors for Baugh and Orta shows

that similar sentences for these two defendants is appropriate. Baugh he was aware that his co-defendant was armed with loaded handguns, much like Orta was aware of the weapons found on the school bus on January 5. Baugh tried to break through the police line at the Lower West Terrace Tunnel, just as Orta did earlier on the West Plaza. However, Orta also removed black metal barricade and bike rack – two important barriers that facilitated the flow of rioters into the restricted area.

In *United States v. Geoffrey Shough*, 22-cr-197-DLF, the defendant was one of the first individuals that pushed through, overwhelmed, and made physical contact with officers during the second breach of the Senate Wing Door at 2:48 p.m. The government requested an 11-month sentence for Shough, and the Court sentenced him to six months' imprisonment. Like Orta, Shough was girded for battle. In comparison, Orta is more culpable than Shough because he obstructed, impeded, and interfered with officers in several different ways—by removing barricades, by throwing an object at officers, and then by pushing forcibly against the police line and bike rack barricade.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[8] Generally, restitution under the VWPA must "be tied to the loss

---

[8] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at

caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Orta must pay $2,000 in restitution, which reflects in part the role Orta played in the riot on January 6.[9] Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Orta's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 119.

## VIII. FINE

The defendant's conviction for violations of civil disorder subject him to a statutory

---

18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[9] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

maximum fine of $250,000. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines provide for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023).

The burden is on the defendant to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

Here, the defendant has not shown an inability to pay, thus pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e). The guidelines fine range here is $4,000 to $40,000. U.S.S.G. § 5E1.2(c).

IX.    **CONCLUSION**

For the reasons set forth above, the government recommends that the Court impose a sentence of 12 months' incarceration, three years of supervised release, restitution in the amount of $2,000, and a special assessment fee of $100.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


BY:    _/s/ Sarah W. Rocha_____
SARAH W. ROCHA
Trial Attorney
D.C. Bar No. 977497
601 D Street NW
Washington, DC 20579
Telephone:   202-330-1735
sarah.wilsonrocha@usdoj.gov

25